■ In the Matter of ROCKWOOD PIGMENTS NA, INC., Respondent, v ELEMENTIS CHROMIUM LP, Appellant. [2 NYS3d 94]—

Order, Supreme Court, New York County (Melvin L. Schweitzer, J.), entered August 15, 2014, which granted the petition for a preliminary injunction in aid of arbitration, unanimously modified, on the law, to remit the matter for fixing of an adequate undertaking, and otherwise affirmed, without costs.

Petitioner is a subsidiary of a large, multinational company that makes and sells specialty chemicals and advanced materials. Respondent is a subsidiary of a large, multinational company that makes various chemical products. On August 31, 2007, the parties entered into a distribution agreement whereby petitioner agreed to market and sell certain products manufactured by respondent.

Section 2.1 of the agreement appoints petitioner the exclusive distributor of the products, while section 2.4 directs petitioner to "promote the sale and Use of the Products throughout the Territory in a commercially reasonable manner generally consistent with past practices of the Business." Section 2.5 provides that if, during any 12-month period after the three-year anniversary of the agreement's effective date (Aug. 31, 2007), petitioner purchases less than four million pounds of the product, then its appointment as the exclusive distributor "shall automatically (without any action required by either party) be converted to an appointment as a non-exclusive distributor."

Section 6.1 provides that the agreement will be in effect through at least the eighth anniversary of the effective date (Aug. 31, 2015), and will be automatically renewed for successive 12-month terms unless either party gives written notice of termination to the other at least 12 months prior to the expiration of the initial term or any subsequent 12-month renewal term. Section 6.2 provides that the agreement may be terminated as follows: by written agreement between the parties; by respondent if petitioner ceases to function as a business or takes advantage of any insolvency laws; or if either party materially breaches the agreement, where the other party provides "written notice of termination sent to the party in breach or default, not less than forty-five (45) days before such termination is to become effective, and such termination shall become effective on the date specified in said notice unless such breach or default, if capable of being cured or corrected, is cured or corrected within forty-five (45) days of the giving of such notice of

termination." Section 6.5 provides that by reason of the agreement's termination, expiration, or nonrenewal, neither party "shall be liable to the other . . . for compensation, reimbursement or damages on account of the loss of prospective profits on anticipated sales or on account of expenditures, investments, leases or commitments in connection with the business or goodwill of [either party] or otherwise."

Section 15 provides that all disputes arising out of or relating to the agreement, or the breach thereof, shall be submitted to arbitration before the American Arbitration Association.

By notice dated May 31, 2014, respondent informed petitioner that it was terminating its distributorship because of petitioner's poor sales performance over an extended period, which evidenced a failure to use commercially reasonable means consistent with past business practices, in breach of section 2.4 of the agreement. Shortly thereafter, petitioner commenced this proceeding to enjoin respondent from terminating the agreement pending arbitration (CPLR 7502 [c]).

Supreme Court properly granted the petition. Petitioner showed a substantial likelihood of success on the merits of its claim of wrongful termination of the agreement (*see Four Times Sq. Assoc. v Cigna Invs.*, 306 AD2d 4 [1st Dept 2003]). Respondent purported to terminate the agreement on the ground of petitioner's alleged "failure to use commercially reasonable efforts generally consistent with past practices," resulting in "forecasting and sales performance that ha[d] not met expectations." In essence, respondent was dissatisfied because it was "losing customers and market share."

However, the distribution agreement provides that if annual sales of respondent's product fall below four million pounds, the agreement is automatically converted from an exclusive agreement to a nonexclusive agreement. It does not make decreased sales a basis for termination. Thus, when sales fell below the four million pound threshold in 2012, petitioner's distribution rights became nonexclusive. The decrease in sales was not a material breach warranting termination. To the extent respondent claims it terminated the agreement because of petitioner's practice of "bundling" its products rather than marketing them individually, we find this argument disingenuous, the real complaint being decreased sales and market share.

Moreover, the agreement requires respondent to provide 45 days' notice of termination and an opportunity to cure. However, 11 days after informing petitioner of its purported termination, respondent email "blasted" petitioner's customers, informing them that petitioner's distribution rights had been terminated

and that new orders should be placed with a subsidiary of respondent's. To the extent respondent argues that any attempt to cure would have been futile, petitioner's correspondence after the termination suggested a partial cure. The testimony of respondent's commercial director, Francis Murphy, that petitioner could not remedy the problem with a price adjustment within 45 days, due to its internal operating procedure, does not avail respondent since Murphy was not qualified to render an opinion as to petitioner's ability to adjust its pricing.

Petitioner also showed that it would suffer irreparable injury in the absence of preliminary injunctive relief. The distribution agreement prohibits the recovery of damages for lost profits on anticipated sales and for lost business damages due to diminished goodwill. Thus, absent preliminary relief, petitioner's ability to be made whole after a wrongful termination would be seriously jeopardized. Further, respondent's email "blast" to respondent's customer base threatened petitioner's business operations and its creditworthiness (*see e.g. Bell & Co., P.C. v Rosen*, 114 AD3d 411 [1st Dept 2014]).

The balance of equities supports preliminary injunctive relief. Petitioner has only a month's supply of respondent's product in reserve; losing the product will cause its customers to seek other distributors, and maintaining the status quo pending arbitration (which petitioner seeks to expedite) will not cause significant harm to respondent.

Absent preliminary injunctive relief, an arbitration award in petitioner's favor would be ineffectual, since petitioner seeks specific performance of the parties' contract, and if respondent is allowed to terminate at this juncture, petitioner's customer base will be seriously disrupted. As Supreme Court observed, "[T]here will be nothing left for the arbitrators to resolve."

Inasmuch as petitioner should have been required to post an undertaking, the matter must be remitted to Supreme Court to fix the amount of the undertaking (CPLR 6312 [b]; *see e.g. Karabatos v Hagopian*, 39 AD3d 930 [3d Dept 2007]). Concur—Friedman, J.P., Acosta Moskowitz, Richter and Clark, JJ.